A04A1722. IN THE INTEREST OF C. B., a child.
(609 SE2d 130)

MILLER, Judge.

The father of minor C. B. appeals from the juvenile court's order terminating his parental rights with respect to C. B. On appeal he contends that (1) the State did not show by clear and convincing evidence that the termination of his parental rights was warranted, and (2) the juvenile court erred in failing to set aside its nonreunification order. We discern no error and affirm.

1. In deciding the issue whether clear and convincing evidence showed that terminating the father's parental rights was warranted, our responsibility as an appellate court is well established:

> Construing the evidence most favorably to the findings of the court, the question on appeal is whether a rational trier of fact could have found clear and convincing evidence (a) of parental misconduct or inability and (b) that terminating

parental rights was in the best interest of the child. Parental misconduct or inability is shown by evidence (i) the child is deprived, (ii) lack of parental care caused the deprivation, (iii) such is likely to continue, and (iv) the continued deprivation is likely to cause serious harm to the child.

(Citations omitted.) *In the Interest of K. D. S.*, 237 Ga. App. 865 (1) (517 SE2d 102) (1999); see OCGA § 15-11-94 (a), (b) (4) (A).

2. *Parental Misconduct or Inability.* Construing the evidence in the light most favorable to the juvenile court's findings, we will address each of the aforementioned factors.

(a) *Deprivation.* The evidence reveals that in March 2000, the juvenile court found by clear and convincing evidence that C. B. was deprived and ordered that the child be placed in the temporary legal custody of the Department of Human Resources (the "Department"). Following a February 2001 hearing on the Department's request for an extension of custody, the court found again by clear and convincing evidence (in an order dated April 25, 2001) that the child remained deprived in that "the father has made little progress toward the completion of the goals of his case plan" and "the issues of deprivation [previously] found by [the] Court . . . remain unresolved." As these orders were not appealed, the father was bound by these findings for purposes of the termination hearing. See *In the Interest of R. G.*, 249 Ga. App. 91, 93 (1) (a) (547 SE2d 729) (2001).

(b) *Lack of Parental Care or Control.* The March 2000 court order that determined that C. B. was deprived also stated that the deprivation occurred as a result of the "psychological and mental issues regarding the parents, failure to provide for the basic needs of the child, medical neglect, and physical neglect of the child." The father was also bound by this court finding for purposes of the termination hearing. *In the Interest of R. G.*, supra, 249 Ga. App. at 93 (1) (a).

Moreover, the evidence revealed that within months after C. B. was born, she required hospitalization for severe malnutrition. The father was the one responsible for feeding C. B. at the time she needed to be hospitalized. The Department sought and obtained temporary custody of C. B. on March 15, 2000, and the juvenile court determined that the child was deprived. A case plan for reunification was formulated.

The father failed to comply with many of the goals of his case plan, including the goals of visiting C. B. on a consistent basis (visiting her for a total of only four hours from January 22, 2001 to August 1, 2001), completing parenting classes, attending anger management classes, and working cooperatively with the Department (as he was often hostile to Department workers). Based on the

father's failure to comply with the reunification plan, the court on September 4, 2001 found that reunification was no longer an appropriate plan.

In addition, on September 11, 2001, the father was convicted of disorderly conduct for an incident involving his then girlfriend and mother of another one of his children. The incident occurred after he had written two harassing notes to this woman relating to a child support dispute, one of which read "I hate all of you!! [E]specially that little brat, [B.]!" The "little brat" reference was to a child that he had with the woman.

Only after the nonreunification order was entered with respect to C. B. did the father make an effort to comply with the goals of his original case plan. He attended anger management and parenting classes. However, at the termination hearing he had no specific plans for what he would do to raise a special needs child like C. B. He had failed to attend any of C. B.'s doctor's appointments, did not know what was required to address C. B.'s special needs, and had not asked any of C. B.'s doctors about the specifics of dealing with C. B.'s breathing disorder, malnourishment, and other medical problems. After the nonreunification order, the father succeeded in visiting C. B. on a more consistent basis, but sometimes paid little attention to her and failed to create a substantial bond with her. C. B. was more bonded to her foster parents, with whom she was thriving, and would cry and become aggressive whenever she had to visit her father.

The father also underwent a psychological examination prior to the termination hearing, and the psychologist determined that the father "would have difficulty managing a child who had no difficulties in day to day living, but even more problems . . . with a child with a fragile condition and with medical difficulties." In light of C. B.'s special needs, the psychologist further concluded that returning C. B. to her father "would place [her] at risk for physical, medical, or emotional neglect." Significantly, C. B.'s doctor and two psychologists who observed C. B.'s interactions with her father also concluded that returning C. B. to him could cause her additional physical, emotional, and psychological harm. A Department case manager also testified as to the significant risk posed to C. B. if she were returned to a parent with whom she was not bonded and who could not meet her special needs.

Accordingly, a rational trier of fact could have found clear and convincing evidence that the father's lack of proper parental care or control caused the child to be deprived. See OCGA § 15-11-94 (b) (4) (C) (i)-(ii).

(c) *Lack of Care or Control Likely to Continue.* Evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the child is returned to her parent. *In the Interest*

*of A. A.*, 252 Ga. App. 167, 172 (2) (c) (555 SE2d 827) (2001). Prior to the original deprivation hearing, C. B. had been admitted to the hospital with signs of neglect such as severe malnourishment. The father admitted that he was responsible for feeding C. B. at that time. Nevertheless, at the time of the termination hearing, the father still had not learned about what was specifically necessary to feed and care for a child with the nutritional and other medical problems that C. B. possessed.

Even in light of some evidence that the father made an effort to comply with a portion of his original case plan, such an effort is not conclusive of parental fitness in light of his prior history. See *In the Interest of A. G.*, 253 Ga. App. 88, 90-91 (1) (c) (558 SE2d 62) (2001). Indeed, even after taking some parenting classes, the results of the father's psychological examination revealed that he was unprepared to raise a child with special needs. This evidence, along with the other evidence detailed above, authorized the juvenile court's finding that the lack of proper parental care or control was likely to continue. "[T]he juvenile court was authorized to infer from the evidence of past conduct that the improvements in the [father's] situation were not sufficient to justify maintaining the [child] in foster care limbo in hopes that the [father] could achieve stability and provide an adequate home for [his child]." (Footnote omitted.) Id. at 91 (1) (c).

(d) *Serious Harm to the Child.* The juvenile court was authorized to find from the same evidence detailed above that the deprivation was likely to cause serious physical, mental, emotional, or moral harm to the child. See, e.g., *In the Interest of A. M. L.*, 242 Ga. App. 121, 124 (1) (d) (527 SE2d 614) (2000). Indeed, the father's inability to take care of C. B. early in life had already created circumstances that led to C. B.'s admission to a hospital with signs of serious neglect. The father's lack of attention to C. B. before the juvenile court's ruling that reunification was inappropriate further undermined any bond between him and the child.

Thus, we conclude that the juvenile court could have found clear and convincing evidence of parental misconduct or inability.

3. *Best Interest of the Child.* When clear and convincing evidence exists of parental misconduct or inability, the juvenile court then considers whether termination of parental rights is in the best interest of the child, in light of the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home. OCGA § 15-11-94 (a). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement." (Citations and punctuation omitted.) *In the Interest of J. B. A.*, 230 Ga. App. 181, 185 (2) (495 SE2d 636) (1998). C. B. showed dramatic and immediate improvement after placement with her

foster parents, and evidence revealed that returning her to her father would have been a substantial step backward for her.

Since a rational trier of fact could have found (1) clear and convincing evidence of parental misconduct or inability and (2) that termination of parental rights was in the best interest of C. B., the juvenile court did not err in terminating the father's parental rights to C. B.

4. The father argues that the juvenile court erred in refusing to set aside its September 4, 2001 nonreunification order. He claims that the Department committed fraud and misled the court into concluding that the father had not taken a psychological examination (when in fact he had), since the Department did not present the psychologist's report at the permanency hearing. We find the father's arguments to be without merit because (1) there is no evidence in the record that the Department deliberately withheld the report or misled the court (see OCGA § 15-11-40 (a) (1)); (2) there was no reason why the father himself could not have presented evidence at the permanency hearing that he had taken a psychological examination; and (3) there was ample evidence to support the court's nonreunification order, regardless of whether or not the father had taken a psychological examination. See, e.g., *In the Interest of R. N. R.*, 257 Ga. App. 93, 95 (1) (570 SE2d 388) (2002).

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED DECEMBER 30, 2004.

*Christopher M. Miller*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Laura W. Hyman, Assistant Attorney General, Dana M. Thompson, John D. Cline*, for appellee.