In the Matter of the WELFARE of the Children OF M.A.H. and R.J.H., Parents.

No. A13–0834.

Court of Appeals of Minnesota.

Nov. 18, 2013.

733

Michelle M. Zehnder Fischer, Nicollet County Attorney, St. Peter, MN, for appellant Nicollet County.

Jason C. Kohlmeyer, Roxann M. Beranek, Rosengren Kohlmeyer Law Office Chtd., Mankato, MN, for respondents M.A.H. and R.J.H.

Bailey Breck Rolfsrud, Mankato, MN, for respondent A.J.H.

Susan Kohls, St. Peter, MN, guardian ad litem.

Considered and decided by JOHNSON, Presiding Judge; SMITH, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.*

Appellant county challenges the district court order terminating respondents' parental rights as to one child, but not as to the child's three siblings. On cross-appeal, respondents challenge the district court's order terminating their parental rights to one child. Because the severe malnutrition of and psychological harm done to the child was sufficient to establish the existence of a statutory ground for termination as to that child, but did not mandate termination of parental rights as to his siblings, we affirm.

## FACTS

The following factual summary is based on uncontested recitals and findings in the district court's 53–page order. M.A.H. and R.J.H. are the biological parents of A.J.H. and, by adoption in 2008, the parents of P.P.H., T.S.H., and N.M.H. In November 2012, when this proceeding began, A.J.H. was ten years of age, P.P.H. was eight, T.S.H. was seven, and N.M.H. was five. R.J.H. works out of the home as an account executive for a shipping consulting firm, earning approximately $100,000–110,-000 per year. M.A.H. is a stay-at-home parent and part-time massage therapist. Between 2005 and 2012, R.J.H. and M.A.H. were also licensed foster care providers.

P.P.H., T.S.H., and N.M.H. were initially placed with M.A.H. and R.J.H. in 2007, as foster children, and lived with them for approximately one year prior to their adoption by M.A.H. and R.J.H. A petition to terminate the parental rights of their biological parents had been filed in November 2006, based on the discovery that T.S.H. had multiple broken bones and other injuries. Their biological father admitted to causing many of these injuries. Based on egregious harm to T.S.H., the district court ordered termination of the biological parents' rights as to P.P.H., T.S.H., and N.M.H. This court affirmed on appeal.

In September 2007, P.P.H. and T.S.H. were examined by a licensed child psychologist. The psychologist diagnosed P.P.H. with reactive attachment disorder (RAD), post-traumatic stress disorder (PTSD), and developmental delays. She diagnosed T.S.H. with PTSD and provisionally diagnosed him with RAD. The psychologist made a series of parenting recommendations following the evaluations. She strongly recommended that P.P.H. receive ongoing psychotherapy, that physical discipline be avoided, and that food not be used as a reward or punishment. She expressed concerns about homeschooling because of P.P.H.'s need to be exposed to a variety of adults and children. A follow-up appointment, which was scheduled for P.P.H. and T.S.H. to see this psychologist, never took place.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

M.A.H. and R.J.H. followed some but not all of the psychologist's recommendations. They did not seek psychiatric care or professional counseling for any of the children. They used spanking as a punishment, at least for a period of time, sometimes spanking the children with objects. They denied withholding food as punishment, but as discussed below, P.P.H.'s eating schedule and diet became problematic. R.J.H. also told medical personnel that they sometimes withheld food from a child until chores were finished, and that this delay was as much as a half a day. And although they did not isolate the children, they did homeschool them.

P.P.H. has had food issues that pre-date his placement with M.A.H. and R.J.H. In early 2007, his then foster-parents observed that he had "texture issues" relating to eating, strongly preferring meat. During the 2007 psychological examination, M.A.H. reported that P.P.H.'s problems included non-stop eating, failing to stop eating when full, repeatedly asking about the next meal, and an apparent fixation on food. M.A.H. testified at trial that for the first year P.P.H. lived with them, they had to overcook or mash his food or he would throw up after eating.

M.A.H. testified that even after the texture issue was resolved, P.P.H. took food from a family compost pile and from a bird feeder, and that he helped himself to raw hamburger from the refrigerator. M.A.H. and R.J.H. sewed the pockets of his pants shut and removed the bird feeder. To stop him from sneaking food at night, they slept in the hallways outside of his room for up to four months in 2010 and put an alarm on his bedroom door. They also enlisted the other children in monitoring P.P.H.'s behavior.

In the fall of 2011, M.A.H. and R.J.H. became aware that P.P.H. was regurgitating and ruminating (throwing up and re-eating) his food. In November 2011, M.A.H. and R.J.H. took P.P.H. to see a chiropractor who was the family's primary health care provider. The chiropractor observed that P.P.H. was shorter than his younger siblings. In December 2011, the chiropractor arranged to have blood work done on P.P.H. The chiropractor reported that the blood testing did not reveal any significant concerns or conditions. At P.P.H.'s dental appointment in February 2012, M.A.H. told the dentist that he was regurgitating on a "pretty regular basis." At a subsequent dental appointment, M.A.H. told the dentist that P.P.H. was still regurgitating. At both appointments, the dentist informed M.A.H. that P.P.H.'s regurgitation was causing damage to his teeth.

In about September 2012, M.A.H. spoke to the chiropractor who previously saw P.P.H. about his continuing regurgitation. The chiropractor suggested feeding P.P.H. a liquid nutritional supplement, in the belief that this might reduce the regurgitation and increase absorption of nutrients. M.A.H. purchased the supplement. M.A.H. and R.J.H. testified that P.P.H. seemed to improve briefly after beginning the supplement, but that his condition began to decline again.

P.P.H. also had ongoing issues with nocturnal enuresis (bedwetting). M.A.H. and R.J.H. took P.P.H. to the chiropractor in 2008 and 2009 to perform an "adjustment" to address the issue. It does not appear that this treatment was effective. M.A.H. and R.J.H. also had P.P.H. wear pull-ups to bed, left a "potty" chair in his room, and put a waterproof mattress cover on his bed. In August or September 2012, they purchased a plastic sled and had P.P.H. sleep in the sled so that he would not get urine on the bed or floor. P.P.H.'s siblings testified that P.P.H. was sometimes hosed off in the morning after he wet the bed,

with T.S.H. having the task of handling the hose.

Except for the chiropractic and dental contacts, from 2007 to October 2012, P.P.H. did not receive any professional medical care. On October 9, 2012, M.A.H. noticed that the front of P.P.H.'s shirt was red. Being concerned that he might have vomited blood, she contacted the doctor who had treated N.M.H. prior to her adoption. The doctor told M.A.H. to take P.P.H. to the emergency room. Prior to reaching the hospital, M.A.H. either suspected or concluded that the red on P.P.H.'s shirt was juice from popsicles he had eaten without permission.

In October 2006, P.P.H. weighed 29.4 pounds and was 3 feet tall, within the normal range for a two-year-old child, and was in "good general health." On examination at the hospital in 2012, he weighed only 34.76 pounds and was 3 feet 5 inches tall, below the third percentile for an eight year old. He was mildly hypothermic, had low blood pressure, and a slow heartbeat. Blood work indicated that he had "concerningly low" hemoglobin and low levels of electrolytes. He had a protruding belly, common in people suffering from starvation. The examining doctor described him as "extremely thin, small stature, almost emaciated appearing." When the doctor told M.A.H. that P.P.H. would have to be hospitalized, she said, "See [P.P.H.], this is what happens when you do things like this."

P.P.H. was transferred to the pediatric-critical-care unit at the Mayo Clinic in Rochester. Testing at Rochester revealed brain volume loss as well as a lack of fat in the subcutaneous and marrow areas of the brain. A bone-age test revealed his bone age to be 6 years and 6 months, three standard deviations below the mean. He was moved to the general-pediatric unit after one night in the critical-care unit. A physician with the child and adolescent psychiatry unit described him as "strikingly thin and emaciated."

On October 11, P.P.H.'s Mayo Clinic physicians became concerned that he was developing "refeeding syndrome," a rare and sometime fatal disorder that sometimes occurs when a severely malnourished individual begins to eat. This condition is characterized by an extremely low level of phosphorus. A phosphorus level below 2.0 is a matter of medical concern; P.P.H.'s fell as low as 0.4. One of P.P.H.'s primary physicians testified that during 39 years of practice, he only saw phosphorus levels lower than P.P.H.'s once, an adult with anorexia. As part of his treatment, P.P.H.'s physicians recommended that he be fed dairy products, a good source of phosphorus. M.A.H. and R.J.H. objected, as they kept their children on a nondairy diet because of M.A.H.'s belief that consumption of dairy products stresses the immune system and makes a person more susceptible to illness. They suggested alternative sources of phosphorus instead.

P.P.H. remained in the Mayo pediatric unit until October 15, when he was transferred to the child-and-adolescent-psychiatry-hospital service unit, primarily to address his eating issues. He continued to regurgitate and show preoccupation with food while hospitalized, but these behaviors gradually diminished, and the regurgitation ultimately stopped. His phosphorus levels continued to fluctuate even after the transfer, and his diet was closely monitored.

M.A.H. told the Mayo Clinic staff that she believed P.P.H.'s food issues stemmed from his desire to control situations and to gain attention. P.P.H. reported that his main concern is feeling that he will not get enough to eat. At a later meeting with one of P.P.H.'s Mayo Clinic physicians, R.J.H. was unable to explain how P.P.H.

had become so underweight even though he was supposedly offered adequate amounts of food.

At the termination-of-parental-rights trial, there was extensive testimony. P.P.H.'s primary physician at the Mayo Clinic's psychiatry unit testified that P.P.H.'s malnourished state was not the result of an internally driven eating disorder, but was likely caused by an external or environmental source. He stated that children with internally driven eating disorders oppose change, hide the disordered eating behaviors, and try to not comply with treatment. But where the malnourishment is external or environmental, the child will generally comply with treatment and will show consistent improvement over time. The doctor testified that P.P.H. fits the latter description and that there was no sign that any medical condition caused P.P.H.'s malnourishment.

The doctor also testified that a child in P.P.H.'s state of malnourishment would likely experience severe hunger and be preoccupied with food. He might feel tired and weak, demonstrate confusion, and not think as logically as a normally nourished child. The doctor was of the opinion that a parent of a child in this condition should have been able to detect a number of symptoms, including weight loss and lack of growth, the protruding abdomen, actions showing hunger, preoccupation with food, and low energy levels.

After one month at Mayo, P.P.H. was released to foster care. He had gained approximately 15 pounds and had grown an inch. While in foster care, he initially expressed concerns about food, but those issues had abated by the time this proceeding reached trial in January 2013. He had not been observed regurgitating or stealing food. His foster mother reported that he did not appear more manipulative or controlling than a normal child of his age. He continued to have problems with bedwetting. Between November 12 and December 12, he grew an additional inch and gained four pounds. His pediatrician described this as "catch up growth" and indicated that this can occur with children exposed to adequate nutrition after a period of severe malnutrition.

In October 2012, a child-protection report was received by Nicollet County Social Services. A children-in-need-of-protection-or-services (CHIPS) petition was filed with respect to all four children and they were placed in foster care. The matter was transferred to Le Sueur County Human Services due to M.A.H. and R.J.H.'s extended foster-parent relationship with Nicollet County. In an interview with an investigator, M.A.H. reported first noticing P.P.H.'s weight loss in September 2012. She said that he was placed on a liquid diet in an attempt to control his ruminating, which she described as a "control issue." She stated that she felt P.P.H. was now being rewarded and getting a lot of attention for his behavior.

R.J.H. later told the investigator that the family could no longer keep up with P.P.H.'s games, and complained that Mayo Clinic physicians were feeding P.P.H. dairy products against M.A.H. and R.J.H.'s instructions. He reported that the travel to and from Rochester was hard on the family and that these were all P.P.H.'s issues. He stated that he felt P.P.H. had "won," and that it would be hard to have him back home because the hospital staff gave him what he wanted.

Based on the information obtained in the investigation, Le Sueur County Human Services asked the Nicollet County Sheriff's Department to investigate possible criminal charges. The human services investigator and an investigator from the sheriff's department interviewed P.P.H. alone, then interviewed M.A.H. and R.J.H.

and executed a search warrant of their home. During this interview, M.A.H. reported that P.P.H.'s behavior had triggers, and that when something triggered his behavior, he would become defiant, not do chores, lie, and blame others for his actions. She reported that he "had total control of this house."

M.A.H. explained that they follow a "holistic" approach to medical care and attempt the least invasive form of treatment first, such as going to a chiropractor rather than a medical doctor. She stated that she did not take P.P.H. to a medical doctor because the results of the chiropractor's blood tests indicated everything was normal, and because "[a]s a mom I just knew it was mental." She indicated that after the recent weight loss, they had discussed taking P.P.H. to a medical doctor but wanted to wait until after T.S.H.'s October birthday.

Following the execution of the search warrant, the investigators interviewed P.P.H.'s siblings. During the trip to the foster home, the three children were very upset, and made a number of angry statements blaming P.P.H. for their situation, calling him a liar and a thief, and saying that he was bad. During a later trip to the doctor for physicals, they made similar comments. The physicals indicated no medical issues or nutritional deficiencies, and no physical evidence of abuse or neglect. A.J.H., T.S.H., and N.M.H. were assessed by the same psychologist who had worked with P.P.H. and T.S.H. in 2007. She diagnosed A.J.H. with PTSD and attachment issues, and both T.S.H. and N.M.H. with PTSD and RAD.

In November 2012, Nicollet County filed a petition requesting the termination of

M.A.H. and R.J.H.'s parental rights as to all four children. A.J.H., T.S.H., and N.M.H. were in foster care until November 4, when the district court ordered them returned to their parents under various conditions. P.P.H. was not returned to M.A.H. and R.J.H. during this proceeding.[1]

Following the commencement of this proceeding, M.A.H. and R.J.H. underwent psychological and parenting assessments. Both produced invalid or likely invalid results on the Minnesota Multiphasic Personality Inventory–2, with scores indicating defensiveness, an attempt to present a favorable impression, or reluctance to admit to personal flaws and weaknesses. The psychologist who interviewed M.A.H. and R.J.H. concluded that neither had a major mental illness or personality disorder, but both possessed "maladaptive personality features" such as inflexibility, which likely contributed to the current circumstances. She noted that M.A.H.'s focus was on the impropriety of P.P.H.'s rule-breaking, and felt that M.A.H. was not demonstrating an appropriate level of empathy toward P.P.H. She also felt that their use of corporal punishment was not appropriate or effective.

The psychologist's impression was that both parents "had a high need to be in control as parents and that their inflexible attitudes about how their children should behave and what their children should be exposed to in their environment contributed to their reluctance to seek additional medical care for [P.P.H.]." She noted that maladaptive personality features are not especially rare, but are difficult to address in adults because they are well established. She felt that with extensive parenting edu-

---

1. P.P.H. was placed with the family who cared for him and T.S.H. prior to their placement with M.A.H. and R.J.H. His foster father is M.A.H.'s brother, but the two families had extremely limited contact between 2007 and 2012. His foster parents have expressed a willingness to adopt P.P.H., but not his siblings.

cation and therapy, it was "certainly possible" that M.A.H. and R.J.H. could develop insight into their children's conditions.

The parenting assessment included a structured interview with M.A.H. and R.J.H., interviews with the children, observation of P.P.H. in his foster home, and two observation sessions involving the parents and all four children. The county social worker who completed the assessment felt that M.A.H. and R.J.H. showed a lack of empathy for P.P.H., but empathized with the three other children's distress at being removed from their home. Her opinion was that none of the adopted children showed a secure attachment to their parents, and that A.J.H. showed a "compromised attachment."

The social worker testified that the parenting strategy used by M.A.H. and R.J.H. was the opposite of what should have been used with a child with P.P.H.'s background and diagnoses. She testified that their "black and white" approach poses difficulties in parenting a child with PTSD or RAD. She was of the opinion that change would need to come from the parents, and that M.A.H. and R.J.H. would not be able to change or alter their parenting methods to the extent necessary to correct their perceived deficiencies.

The social worker testified that the children need long-term therapy but that this work was unlikely to occur if they remained with M.A.H. and R.J.H. because they would not have emotional safety. She testified that the relationship between P.P.H. and his parents should be viewed as that of "victim and perpetrator." She expressed the opinion that M.A.H. and R.J.H.'s parental rights should be terminated as to all four children. The guardian ad litem assigned to work on the matter spent considerable time on the case and supported the county's request to terminate parental rights with respect to all four children.

After an eight-day trial, the district court terminated M.A.H. and R.J.H.'s parental rights as to P.P.H. on two grounds: egregious harm and palpable unfitness. It rejected termination of their rights as to P.P.H. on the ground of failure to comply with parental duties. It also refused to terminate their parental rights as to the other children on any ground. But it concluded that A.J.H., T.S.H., and N.M.H. are children in need of protection or services. Nicollet County appealed, and M.A.H. and R.J.H. filed a notice of related appeal.

## ISSUES

I. Did the district court abuse its discretion in concluding that M.A.H. and R.J.H.'s parental rights as to P.P.H. should be terminated?

II. Did the district court rule improperly in concluding that M.A.H. and R.J.H.'s parental rights as to A.J.H., T.S.H., and N.M.H. should not be terminated?

## ANALYSIS

A district court has broad discretion when determining whether to terminate parental rights. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn.2008). We closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn.2005). The district court must make findings on multiple statutory factors and determine whether those findings establish a statutory basis for termination. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899 (Minn.App.2011), *review denied* (Minn. Jan. 6, 2012). If the district court finds that statutory grounds exist, it must conduct a separate analysis to determine whether termination is in the best

interests of the child. *In re Welfare of Children of D.M.T.–R.*, 802 N.W.2d 759, 765 (Minn.App.2011).

Reviewing courts engage in a two-step process to determine whether to reverse a district court's decision regarding the existence of a particular statutory basis for terminating parental rights. *J.R.B.*, 805 N.W.2d at 899. We review "findings of the underlying or basic facts for clear error," and review the district court's "determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *Id.* at 901. The burden of proof is on the petitioner, who must overcome the presumption that parents are fit to be entrusted with the care of their child. *In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn.1980). The paramount consideration is the best interests of the child. Minn.Stat. § 260C.301, subd. 7 (2012).

Nicollet County sought termination of M.A.H. and R.J.H.'s parental rights as to all four children because it alleged that (1) M.A.H. and R.J.H. had "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship," (2) M.A.H. and R.J.H. are "palpably unfit to be a party to the parent and child relationship," and (3) P.P.H. "experienced egregious harm in the parent's care." Minn.Stat. § 260C.301, subd. 1(b)(2), (4), (6) (2012). The district court found that Nicollet County met its burden of proof with respect to its request to terminate parental rights as to P.P.H. under the second and third grounds, but not the first. And the district court found that Nicollet County failed to meet its burden with respect to the request to terminate parental rights as to A.J.H., T.S.H., and N.M.H., but adjudicated them children in need of protection or services.

## I.

M.A.H. and R.J.H. argue that the district court abused its discretion when it concluded that the county met its burden to show that P.P.H. suffered egregious harm while in their care and that they were palpably unfit to parent P.P.H. They also argue that termination is not in P.P.H.'s best interests. Nicollet County argues that the district court abused its discretion when it concluded that the county failed to meet its burden to show that M.A.H. and R.J.H. refused or neglected to comply with their parental duties. Because we conclude that the P.P.H. termination is appropriate under the egregious harm provision, we do not address the arguments as to the termination on either the palpable-unfitness basis or the parental-duties basis as those bases apply to P.P.H. *See In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn.2004) ("Termination of parental rights will be affirmed as long as at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests.").

M.A.H. and R.J.H. do not challenge the district court's underlying findings, but argue that the district court abused its discretion in finding that a statutory basis for termination existed. *See J.R.B.*, 805 N.W.2d at 900–01. A district court abuses its discretion if "it makes findings unsupported by the evidence or when it improperly applies the law." *Hemmingsen v. Hemmingsen*, 767 N.W.2d 711, 716 (Minn. App.2009), *review granted* (Minn. Sept. 29, 2009), *appeal dismissed* (Minn. Feb. 1, 2010).

### A. Egregious harm

A district court may terminate an individual's parental rights if the petition-

ing party proves by clear and convincing evidence that:

> [A] child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care.

Minn.Stat. § 260C.301, subd. 1(b)(6). "Egregious harm" includes "the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn.Stat. § 260C.007, subd. 14 (2012). To terminate parental rights based on this provision, it is not necessary to prove that a parent intentionally caused the harm. *In re Welfare of A.L.F.*, 579 N.W.2d 152, 155–56 (Minn.App.1998).

 M.A.H. and R.J.H. argue that P.P.H.'s malnourishment does not constitute egregious harm because they assert that he suffered from abuses that occurred in his birth home, and M.A.H. and R.J.H. only failed to cure that harm and chose a "poor medical remedy." They argue that there "was not a lack of care in this case, simply an unsuccessful choice in the type of care used." At oral argument, they asserted that our caselaw has previously required "assaultive behavior" to satisfy the statutory definition of egregious harm.

 The statutory language does not limit "egregious harm" to instances where a child is the victim of assaultive behavior. The language includes any "infliction of bodily harm to a child or neglect of a child" where that act "demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn.Stat. § 260C.007, subd. 14. The definition also incorporates a number of acts which could constitute criminal conduct, including felo-

ny neglect or endangerment. Minn.Stat. § 260C.007, subd. 14(1)-(10).

Although the district court did not address whether M.A.H. and R.J.H.'s treatment of P.P.H. constituted felony neglect or endangerment, examination of that definition ties into what is encompassed by "egregious harm." Felony neglect or endangerment includes "willfully depriv[ing] a child of necessary food, clothing, shelter, health care, or supervision" where the deprivation "harms or is likely to substantially harm the child's physical, mental, or emotional health." Minn.Stat. § 609.378, subd. 1(a)(1) (2012). Felony neglect or endangerment also includes "intentionally or recklessly causing or permitting a child to be placed in a situation likely to substantially harm the child's physical, mental, or emotional health or cause the child's death." Minn.Stat. § 609.378, subd. 1(b)(1) (2012). Also noteworthy, the law mandating reporting of maltreatment of minors defines neglect as including failure to obtain "health, medical, or other care required for the child's physical or mental health ... [and] failure to protect a child from conditions ... including growth delay, which may be referred to as a failure to thrive...." Minn.Stat. § 626.556, subd. 2(f)(1), (2) (2012).

Although Minnesota's "egregious harm" language is unique to our termination-of-parental-rights statute, courts in other states have repeatedly found that termination of parental rights is appropriate where a child has been severely malnourished, even if the parent did not intentionally starve the child. *See In re C.B.*, 271 Ga.App. 173, 609 S.E.2d 130, 132–33 (2004) (affirming termination based on deprivation due to lack of parental care or control where father's conduct resulted in the child's hospitalization for severe malnutrition); *In re Samaria S.*, 347 S.W.3d 188, 206–07 (Tenn.Ct.App.2011) (affirming ter-

mination based on "knowing neglect" where parent was instructed in proper care of her infant children but children were later hospitalized with near fatal malnutrition); *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114, 117 (1980) (affirming termination where child was malnourished and parents refused to follow the advice of qualified physicians, although as noted in a dissenting opinion, it was not necessarily clear whether the malnutrition was the result of illness or direct acts by the parents).

■ We conclude that the Minnesota definition of egregious harm is sufficiently broad to encompass a situation where a parent knows or should have known that a child suffers severe malnourishment and neglects to obtain appropriate medical care.

The record contains clear and convincing evidence that P.P.H. suffered bodily harm or neglect while in M.A.H. and R.J.H.'s care. Between the time he was placed with M.A.H. and R.J.H. and the time he was admitted to the hospital, his physical condition declined from that of a healthy two-year-old child to below the third percentile for his age in height and weight. The medical professionals who treated him described his condition as "emaciated," reported that he had a protruding abdomen, and compared his physical symptoms to those of an adult anorexic. His bone growth was three standard deviations below average, he suffered brain atrophy, and he developed refeeding syndrome, a potentially fatal condition associated with individuals so severely malnourished that their bodies are unable to process proper nutrition.

The evidence is likewise clear and convincing that this condition cannot be attributed to the harm P.P.H. suffered in his birth home or to a mere misjudgment in care by M.A.H. and R.J.H. P.P.H. was not malnourished or developmentally delayed when he was placed with M.A.H. and R.J.H. The underlying psychological issues of PTSD and RAD were diagnosed shortly after his placement, and his issues with food noted by the foster parents who cared for him when he was first removed from his biological home. But the record is clear that M.A.H. and R.J.H. were aware of these issues, that they repeatedly neglected to obtain appropriate professional assistance in light of many warning signs, and that they declined to follow the psychologist's recommendations for his care. And within a short time after P.P.H. was removed from M.A.H. and R.J.H.'s care, he gained weight and height, and his regurgitation and rumination gradually declined and stopped. Thus, because this record shows that P.P.H. suffered severe, life-threatening malnutrition arising from the failure of M.A.H. and R.J.H. to obtain proper medical and psychological care for P.P.H., we conclude that this record supports the district court's finding that P.P.H. suffered "egregious harm" under Minn.Stat. § 260C.007, subd. 14.

## B. Basis to terminate parental rights

■ The district court found that the harm suffered by P.P.H. was, under Minn. Stat. § 260C.301, subd. 1(b)(6), of a nature, duration, and chronicity that indicated a lack of regard for P.P.H.'s well-being, such that a reasonable person would believe it contrary to his best interests to remain in M.A.H. and R.J.H.'s care. As the district court noted, "[i]t is difficult to envision an aspect of parental care that is more basic than the duty or responsibility to insure that a child's need for nourishment is met." The district court found that this met the requirement of the statute requiring the "nature" of the harm to the child to indicate a lack of regard for the child's well-being sufficient to show that it is con-

trary to P.P.H.'s best interests to remain in the care of M.A.H. and R.J.H.

The district court also found that, based on the testimony of the medical experts, P.P.H.'s condition did not arise from a rapid onset, but would have taken "weeks if not months" to reach the state of malnutrition P.P.H. was in when he was admitted to the hospital. The district court found that this met the "duration" requirement of the statute. And the district court found that P.P.H.'s malnourished state was not the result of a single act, but "multiple acts occurring on a daily basis over numerous days." The district court also noted testimony from M.A.H. and R.J.H. describing P.P.H.'s food issues as "cyclical." The district court found that this evidence satisfied the requirement of "chronicity."

M.A.H. and R.J.H. focus on what they characterize as the well-intentioned but erroneous "medical decision" to supplement P.P.H.'s meals as if this decision was the isolated cause of P.P.H.'s hospitalization. But the district court found that his condition was the result of a series of "unfortunate and, to a large extent, preventable circumstances." These circumstances included M.A.H. and R.J.H.'s decisions not to follow the advice offered by the psychologist, not to seek professional assistance in raising a child with known psychological and food issues, to utilize a "strict and inflexible" parenting approach at odds with the needs of a child with P.P.H.'s psychological makeup, and to decline to seek any medical attention for serious, recurring food and bedwetting issues other than limited consultations with a chiropractor.

Finally, M.A.H. and R.J.H. point to the testimony of their friends and neighbors as evidence that the district court's conclusion that "a reasonable person would believe it contrary to the best interests of the child or of any child to be in the parent's care" is an abuse of discretion. The district court heard testimony from a number of individuals from the family's church, as well as families whose children were placed with M.A.H. and R.J.H. for foster care. These individuals testified that M.A.H. and R.J.H. are good parents and that they would leave their own children in M.A.H. and R.J.H.'s care. M.A.H. and R.J.H. note that many of these witnesses are mandatory reporters, and yet none of them believed it necessary to file a child welfare report based on P.P.H.'s condition.

The district court considered the testimony of these witnesses, noting that given the "significant practical parental experience" of many of them, "one would expect that more flaws would have been observed if [the parental] relationship was as weak as the experts suggest." But as to P.P.H.'s condition, the record is clear that every medical professional who examined him in the fall of 2012 considered his condition to be extremely serious or life-threatening. On cross-examination, most of the lay witnesses testified that they were not aware of the opinions of the medical professionals or the severity of P.P.H.'s condition, and that their contact with the family was limited to church attendance or social settings. The district court's findings on this factor were based on an evaluation of witness credibility and weighing of conflicting evidence, two areas where we defer to the district court on review. *See Gada v. Dedefo,* 684 N.W.2d 512, 514 (Minn.App.2004).

In addition to the bodily harm P.P.H. suffered due to severe malnutrition, there is also evidence that he suffered emotional and psychological harm due to his treatment by M.A.H. and R.J.H. The district court found that the methods chosen to address his bedwetting—having him sleep in a sled and requiring a brother to hose him off in the morning—were inappropriate. During his hospitalization, M.A.H.

and R.J.H. continually refused to take responsibility for his condition, blaming his need for control and attention rather than their own parenting decisions. And the comments from his siblings that he was "a thief," "a liar," and "bad" indicate a family dynamic where P.P.H. was vilified rather than given the care he needed. Although individually these harms may not rise to the level of egregious harm, they lend support to the district court's detailed findings and well-reasoned conclusions when it determined that the egregious-harm statutory ground existed to terminate M.A.H. and R.J.H.'s parental rights as to P.P.H.

## C. Best interests

Once a district court determines that at least one of the statutory grounds for termination has been met, it must also find that termination is in the child's best interests. *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn.App.2012). This analysis consists of weighing three primary factors: the child's interest in maintaining the parent-child relationship, the parents' interest in maintaining the parent-child relationship, and any competing interest of the child. *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App.1992). Competing interests include a stable environment, health considerations, and the child's preferences. *K.S.F.*, 823 N.W.2d at 668.

As in all termination proceedings, the interests of the child are paramount. *In re A.S.*, 698 N.W.2d 190, 194 (Minn.App.2005), *review denied* (Minn. Sept. 20, 2005). Determination of a child's best interests is "generally not susceptible to an appellate court's global review of a record," because of the credibility determinations involved, and because of the multiple factors that must be weighed. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn.App. 2003).

M.A.H. and R.J.H. argue that termination is not in P.P.H.'s best interests because he did not suffer egregious harm and should not be separated from a second set of parents, or from his siblings. They argue that given the difficult times that P.P.H. and his siblings have been through together, separation is not in their best interests. And they note that P.P.H. has told his foster mother that he loves his parents and wants to go home.

M.A.H. and R.J.H. do not raise any concerns that the district court did not address. The district court recognized that M.A.H. and R.J.H. expressed a desire to continue the parent-child relationship, and that, at times, P.P.H. has also expressed this desire. But the district court found that P.P.H.'s feelings on this matter appear to be conflicted, citing the testimony of the therapist P.P.H. began seeing following his discharge from the hospital, as well as the possibility that P.P.H.'s opinion may be influenced by a fear of the unknown.

The district court also considered that continuing the parent-child relationship would result in a continuation of the sibling relationship and that this weighed against termination. But the district court concluded that "some of the evidence suggested less sibling attachment [than] would normally be expected." In support of this conclusion, the district court relied on the testimony of the court-appointed social worker who conducted an independent parenting assessment following the commencement of these proceedings, as well as testimony from witnesses that the children blamed P.P.H. for their separation from their parents. The district court also considered that the other children had, to an extent, been involved in the abuse of P.P.H.

The district court's conclusion ultimately relied on P.P.H.'s need for "a home that is better equipped and more capable of addressing his needs." The district court found this to be "a substantial, if not overwhelming consideration." The district court found that the relationship between P.P.H. and his parents had broken down and could best be viewed as that of "victim and perpetrator." It found that M.A.H. and R.J.H. are "highly unlikely" to be able to meet P.P.H.'s mental and emotional needs. Given these considerations, the district court concluded that clear and convincing evidence showed that termination of parental rights was in P.P.H.'s best interests.

M.A.H. and R.J.H. took on the care of a child with known psychological issues but in good physical health, and after five years in their care, P.P.H.'s physical condition had deteriorated to near-fatal malnutrition. They were aware P.P.H. had chronic problems with food and bedwetting, and yet aside from occasional visits to a chiropractor, they not once sought the assistance of a medical professional. They continually blamed P.P.H. for his medical issues, and enlisted the help of their other children in limiting P.P.H.'s access to food and in the humiliating treatment meant to address his bedwetting. When P.P.H. was hospitalized with life-threatening malnutrition, they demonstrated a lack of empathy for his condition, characterizing it as attempts for control and attention. In an incident the district court found especially troubling, they were opposed to the hospital staff providing P.P.H. with dairy products, even though his phosphorus levels were so low as to be life threatening and even though father R.J.H. occasionally consumed dairy products.

Based on this record, we conclude that the district court did not abuse its discretion by finding that it was in P.P.H.'s best

interest that M.A.H. and R.J.H.'s parental rights be terminated. Furthermore, P.P.H.'s physical and psychological symptoms were sufficiently severe that M.A.H. and R.J.H. were effectively on notice that their parenting style was inappropriate given the needs of the child and that professional assistance was necessary. While a reasonable person's opinions on parenting might vary, a child's physical condition should not be allowed to deteriorate to near-fatal malnutrition before his caregivers conclude that their parenting strategy for the child's nutritional problems are inadequate. In this case, P.P.H. only received medical care because M.A.H. believed, apparently erroneously, that he had thrown up blood. Although she testified that she had intended to seek additional medical care, as of the date P.P.H. was hospitalized, there is no evidence that she had made an appointment or other preparation to seek professional help.

It is disturbing that these siblings were required to endure a second termination proceeding, and that P.P.H. has once more been separated from his parents. But it is even more disturbing that P.P.H.'s condition was allowed to progress to an extreme, near-fatal state, especially given the county's involvement with the family through the adoption as well as M.A.H. and R.J.H.'s role as foster parents. As in all termination proceedings, the paramount consideration must be the best interests of the child, and this record clearly and convincingly supports the district court's conclusion that termination is in P.P.H.'s best interests.

## II.

Nicollet County argues that the district court erred when it concluded that the county failed to establish a statutory ground to terminate M.A.H. and R.J.H.'s parental rights as to A.J.H., T.S.H., and

N.M.H. It argues that the district court erred as a matter of law when it found egregious harm as to P.P.H. but declined to find egregious harm as to his siblings. And it argues that the district court abused its discretion when it concluded that termination is not appropriate on the palpable-unfitness ground or the failure-to-comply-with-parental-duties ground. For purposes of this analysis, we assume that termination of parental rights as to P.P.H. could have been based on any of the three grounds alleged by the county.

## A. Egregious harm

■ If any child is found to have experienced egregious harm in an individual's care, that harm may establish the statutory grounds for termination of that individual's parental rights as to any other child. Minn.Stat. § 260C.301, subd. 1(b)(6); *see also A.L.F.*, 579 N.W.2d at 155–56 (concluding that it is not necessary for a parent-child relationship to exist between the parent and the child who suffered egregious harm). Whether the district court correctly applied the law is a legal question, which we review de novo. *In re A.R.M.*, 611 N.W.2d 43, 47 (Minn.App. 2000). The county argues that because the district court found that P.P.H. experienced egregious harm while in the care of M.A.H. and R.J.H., it was obligated to find the existence of statutory grounds to terminate their parental rights as to P.P.H.'s siblings as well. The county urges us to reverse the district court and remand for a best interests analysis.

■ The statute states that a district court *"may* upon petition, terminate all rights of a parent to a child ... if it finds that one or more of the following conditions exist." Minn.Stat. § 260C.301, subd. 1(b) (2012) (emphasis added). This language is permissive, not mandatory. *See* Minn.Stat. § 645.44, subd. 15 (2012)

(" 'May' is permissive."). Further, the determination that statutory grounds exist to support termination of parental rights is left to the discretion of the district court. *See J.R.B.*, 805 N.W.2d at 899, 901 ("[T]o determine whether a particular statutory basis for involuntarily terminating parental rights is present, a district court ... exercises its judgment to address whether that basis for terminating parental rights is present.... [W]e review its determination ... for an abuse of discretion."). This rule recognizes the district court's unique ability to evaluate witness credibility and weigh conflicting evidence. *See Gada*, 684 N.W.2d at 514.

The district court recognized that the egregious harm suffered by P.P.H. "may provide the ... statutory basis to likewise terminate [M.A.H. and R.J.H.'s] parental rights in and to" P.P.H.'s siblings, but the district court declined to do so. Because the district court did not misapply the law, we will only reverse this determination if it is unsupported by the evidence. *See Hemmingsen*, 767 N.W.2d at 716.

■ The record and the district court's extensive and detailed findings are sufficient to support the district court's conclusion. There is no evidence in the record that A.J.H., T.S.H., or N.M.H. suffered the sort of severe harm experienced by P.P.H. After their removal from the home, they were found to be in good physical health and not suffering from malnutrition or developmental delays. Although there is evidence that they experienced emotional or psychological harm, the district court was within its discretion to determine that this harm was better addressed through the CHIPS process rather than termination.

Like P.P.H., T.S.H. was diagnosed with PTSD and provisionally with RAD before being adopted by M.A.H. and R.J.H., but there is no evidence that he has demonstrated similar symptoms as P.P.H. Any

food issues that may have been observed in T.S.H. at the 2007 evaluation do not appear to have continued. After the commencement of this proceeding, A.J.H. was diagnosed with PTSD and attachment issues, and N.M.H. with PTSD and RAD. Like T.S.H., however, there is no evidence that either of them experience symptoms such as ongoing food issues, bedwetting, or struggles for control. And as the district court noted, it is unclear to what extent these diagnoses reflect the trauma of their separation from their parents and this proceeding, as opposed to any conditions experienced by them in their home.

## B. Palpable unfitness

■ A district court may terminate parental rights if it finds that the parents are:

palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn.Stat. § 260C.301, subd. 1(b)(4). The district court concluded that the county did not meet its burden as to A.J.H., T.S.H., and N.M.H. A parent is presumed to be fit to be entrusted with the care of his or her child. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 250 (Minn.App.2003). "The party petitioning to terminate parental rights has the burden of rebutting this presumption." *Id.* But where parents have had their parental rights as to one child involuntarily terminated, there arises a presumption that they are palpably unfit to be a party to the parent-child relation-

ship as to any child. Minn.Stat. § 260C.301, subd. 1(b)(4). The statute is not clear as to whether this presumption may be applied to a child in the same proceeding as the one where the termination giving rise to the presumption takes place. But assuming that the presumption does apply here, the district court's findings clearly indicate that it was satisfied that M.A.H. and R.J.H. introduced sufficient evidence to rebut the presumption.

■ M.A.H. and R.J.H. presented evidence that their relationship with A.J.H., T.S.H., and N.M.H. does not involve the sort of inappropriate "power struggle" they engaged in with P.P.H. Although there is evidence that the other children have suffered some emotional and psychological harm, they exhibit none of the severe symptoms shown by P.P.H. Although there was testimony that they lacked empathy for P.P.H.'s condition, there was evidence that M.A.H. and R.J.H. empathized with the other three children. Perhaps most compellingly, unlike P.P.H., there was no evidence of an urgent and ongoing need for A.J.H., T.S.H., and N.M.H. to receive psychological or medical attention.

M.A.H. and R.J.H. also presented evidence from a number of neighbors and members of their church who testified to their fitness as parents. The district court found that this testimony "suggested a close loving relationship between [M.A.H. and R.J.H.] and the [c]hildren." Although these witnesses failed to observe P.P.H.'s seriously declining physical condition, the district court credited their testimony to some extent, and concluded that the family dynamic was "not as perfect as the lay witnesses perceived, but ... likewise not as dire as the experts have opined."

Although A.J.H., T.S.H., and N.M.H. were made to witness and participate in the mistreatment of P.P.H., the record supports the district court's determination

that these actions do not constitute "grave and weighty reasons" necessary to terminate M.A.H. and R.J.H.'s parental rights to these three children. *See In re Welfare of H.G.B.*, 306 N.W.2d 821, 825 (Minn. 1981). The children were made to observe P.P.H. to ensure he did not eat outside of mealtimes, and at least on a few occasions, T.S.H. was required to hose P.P.H. off. These actions may be sufficient to support a CHIPS adjudication, which the parents do not dispute. But the district court did not abuse its discretion to conclude that the statutory grounds for termination had not been met, and, implicitly at least, it did not rule improperly in concluding that any presumption of unfitness had been overcome.

The county argues that the district court incorrectly focused on the perspective of the children rather than the parents' fitness as parents, or relied on speculative findings, but these arguments are without support in the record and are inconsistent with the statutory language. The district court discusses M.A.H. and R.J.H.'s actions as to A.J.H., T.S.H., and N.M.H. in particular, and concludes that these actions did not constitute palpable unfitness as required by statute. The palpable unfitness provision discusses the parent's acts "before *the* child," and their ability to care for the needs of "*the* child," not, as is the case with the egregious harm provision, the infliction of harm to or neglect of "*a* child" contrary to the interests of "*any* child" to be in the parent's care.

Finally, because the county does not identify which findings were speculative, we cannot conclude that the district court abused its discretion as to this statutory ground.

## C. Failure to comply with parental duties

Termination of parental rights may be appropriate if

the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and either reasonable efforts by the social services agency have failed to correct the conditions that formed the basis of the petition or reasonable efforts would be futile and therefore unreasonable.

Minn.Stat. § 260C.301, subd. 1(b)(2). The county argues that the district court erred when it concluded that grounds for termination had not been met as to A.J.H., T.S.H., and N.M.H. under this provision. Again, the county relies on the argument that "the creation of two groups of children for consideration of this statutory ground was erroneous."

The district court noted that determining the existence of this factor presented a "close call." But it concluded that M.A.H. and R.J.H.'s actions as to A.J.H., T.S.H., and N.M.H. did not meet the requirement that the parents "substantially, continuously, or repeatedly" refused or neglected to comply with their parental duties. The district court focused on M.A.H. and R.J.H.'s actions as to A.J.H., T.S.H., and N.M.H., specifically the acts of exposing them to their maltreatment of P.P.H. and making them participants in that maltreatment. But the district court noted that this involvement was somewhat limited in scope, and concluded, again, that the "nature and severity" of the conduct was better addressed through the CHIPS process.

There is evidence of recommendations that T.S.H. receive additional psychological and audiological care, as well as evaluation of his learning abilities. But there is no evidence that the decision not to seek professional care as to these issues caused T.S.H. any physical, emotional, or psychological harm. Unlike the case of P.P.H., there is also no evidence of warning signs that additional care was necessary. In the absence of this evidence, we do not substitute our judgment for that of the parents, or the district court.

Finally, the county's argument that M.A.H. and R.J.H.'s "abject failure to get … care for P.P.H. warrants a legal conclusion that this portion of the statutory criteria was met as to all children" is unsupported by the statutory language or the record. Like the palpable unfitness provision, the parental duties provision references a failure in "providing *the* child" with such care "necessary for *the* child's physical, mental, or emotional health and development." Minn.Stat. § 260C.301, subd. 1(b)(2) (emphasis added). There is no evidence that the failure to obtain appropriate care for P.P.H. extended to a failure to obtain care for his siblings. Although treatment of other children is a factor to consider, the appropriate focus of the analysis of this ground for termination of parental rights is on the parent's relationship with the child in question.

Although we conclude that the district court did not abuse its discretion when it declined to terminate M.A.H. and R.J.H.'s parental rights as to A.J.H., T.S.H., and N.M.H., we do not conclude, based on this record, that the district court could not have exercised its discretion to do so. We defer to the district court's conclusion that the CHIPS process best serves A.J.H., T.S.H., and N.M.H.'s interests.

## DECISION

Because the district court did not abuse its discretion when it determined that the severe malnutrition and psychological harm suffered by P.P.H. constitutes egregious harm as contemplated by Minn.Stat. § 260C.301, subd. 1(b)(6), and that termination of M.A.H. and R.J.H.'s parental rights is in his best interests, and did not abuse its discretion when it concluded that no statutory grounds for termination of parental rights were established as to his siblings, we affirm.

**Affirmed.**