*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1021**

In the Matter of the Welfare of the Children of: S. J., Parent

**Filed November 30, 2015**
**Affirmed**
**Hooten, Judge**

Ramsey County District Court
File No. 62-JV-14-2821

Patricia J. Stotzheim, Stotzheim Law Office & Mediation, St. Paul, Minnesota (for appellant D.P.)

John J. Choi, Ramsey County Attorney, Kathryn M. Eilers, Assistant County Attorney, St. Paul, Minnesota (for respondent Ramsey County Community Human Services Department)

Renee Michalow, St. Paul, Minnesota (for S.J.)

Nicole Gronneberg, St. Paul, Minnesota (for M.L.)

Patrick McGee, Forest Lake, Minnesota (for J.H.)

Thomas Nolan, St. Paul, Minnesota (for Guardian ad Litem)

Considered and decided by Reyes, Presiding Judge; Hooten, Judge; and Kirk, Judge.

UNPUBLISHED OPINION

**HOOTEN**, Judge

On appeal from the termination of his parental rights, appellant father argues that the district court abused its discretion by concluding that there was a statutory ground for termination and that termination was in the best interests of the child. We affirm.

## FACTS

**Birth of S.P., Initial Proceedings, and Initial Placement with Appellant**

On February 6, 2014, S.P. was born prematurely at 32 weeks gestation to mother S.J.[1] and appellant father D.P. Prior to S.P.'s birth, S.J. was admitted to the hospital in preterm labor, but insisted on leaving the hospital against the advice of medical professionals, who told her that her refusal to undergo treatment increased the risk of complications and death of the unborn baby. Notwithstanding these warnings, S.J. pulled out her IV, claiming that she did not want to lie in bed all day. Because of her refusal to accept treatment to arrest her preterm delivery and the concern that her leaving the hospital against medical advice would result in greater risk to the unborn child, the medical professionals elected to induce delivery of the unborn child.

Once born, S.P. was admitted to the neonatal intensive care unit (NICU), where she remained for nearly a month. The district court found that during S.J.'s visits with S.P. in the NICU, S.J. "exhibited some concerning behavior to medical professionals." The medical professionals determined that S.J. had a "significant mental health history,"

---

[1] S.J.'s parental rights were also terminated by the district court's order, but S.J. did not appeal from the order.

including diagnoses of bipolar disorder, depression, and schizophrenia and that she had no home and was staying with various family members. On March 4, S.P. was medically ready to be discharged, but the hospital would not discharge her to S.J.'s care due to concerns regarding S.J.'s lack of housing and untreated mental health problems. The same day, the St. Paul Police Department placed S.P. on a 72-hour child protective hold.

On March 7, respondent Ramsey County Community Human Services Department (the county) filed a children in need of protection or services (CHIPS) petition, seeking to adjudicate S.P. and her three siblings, who did not have the same father as S.P., as CHIPS. A child protection social worker (case manager) was assigned to this case. On March 11, after S.J. admitted that her children were in need of protection or services, the children were adjudicated as CHIPS, and the county was granted temporary legal custody of S.P. At the time of the CHIPS adjudication, the district court found that S.J. had a prior history with the county, including one maltreatment determination of neglect and two maltreatment determinations of physical abuse regarding S.P.'s siblings. S.P. was placed with appellant on that date.

S.P.'s placement with appellant ended two days later on March 13 after the county received a report of a physical altercation that occurred between appellant and S.J. in the presence of S.P. on March 12. At trial, appellant admitted that he grabbed S.J.'s wig and threw her phone out the window after she called 911. The county removed S.P. from appellant's care because the case manager felt that it was unsafe for S.P. to remain with appellant as a result of this assault. S.P. was eventually placed in foster care with S.J.'s mother.

3

On March 25, 2014, a guardian ad litem (GAL) was appointed to advocate for S.P.'s best interests.

**Relevant Information about S.J.**

In the termination of parental rights (TPR) order, the district court made findings regarding S.J. that are relevant to this appeal. The case manager filed out-of-home placement plans (case plans) for S.J., which required S.J. to accomplish or demonstrate a number of things in order to regain care, custody, and control of her four children. The components of S.J.'s case plans included obtaining a psychological assessment and following all recommendations, seeing an individual therapist, identifying a psychiatrist and following all medication recommendations, completing a parenting assessment and following all recommendations, participating in in-home parenting services, finding affordable and stable housing, finding employment, and cooperating with random weekly urinalysis testing. Early in this case, the case manager explained to S.J. the county's safety concerns that prevented her four children, including S.P., from returning to S.J.'s care, including her history of untreated mental illness, unstable housing, and child-protection intervention.

In its TPR order, the district court found that S.J. "did not successfully complete, or fully engage with, [the] services identified in her case plans." First, S.J. did not address her chemical dependency issues. In April 2014, her urinalysis sample tested positive for cocaine. In May and early June 2014, S.J. submitted urinalysis samples that tested negative for non-prescribed mood altering substances. But, S.J. did not submit any urinalysis samples from June 2014 until April 2015, at which time her sample again

4

tested positive for cocaine. S.J. testified that from November 2014 to March 2015 she used cocaine weekly. S.J. was referred for a chemical assessment in March 2015, but cancelled one appointment and failed to attend another. At trial, S.J. stated that she was not chemically dependent and that she did not believe her drug use negatively affected her ability to parent her children.

Second, S.J. did not successfully engage in psychotherapy and did not demonstrate compliance with medication management. S.J. did complete several psychological assessments, which noted past diagnoses of bipolar disorder and posttraumatic stress disorder. In May 2014, she was diagnosed with posttraumatic stress disorder and depression, but she did not complete any individual or group psychotherapy except for two sessions in March or April 2014. S.J. testified that she did not believe she needs individual psychotherapy and that she did not believe her mental health problems negatively affected her ability to parent her children.

Third, S.J. underwent a parenting assessment, but did not comply with the recommendations, which included engaging in individual psychotherapy, abstaining from mood-altering substances, and attending parenting education and skills training.

**Refusal to Sign Case Plan**

On April 11, 2014, the case manager filed a case plan for appellant, with a start date of March 4, 2014. The case plan required appellant to accomplish or demonstrate the following in order to regain care, custody, and control of S.P.: (1) complete a parenting assessment and follow all recommendations; (2) participate in parenting support groups at the FATHER Project; (3) secure basic resources for his family;

5

(4) maintain employment; (5) maintain stable housing; (6) have weekly visits with S.P; (7) attend all of S.P.'s medical appointments; and (8) satisfy his child-support obligations. The case plan also stated that appellant needed "to demonstrate that he can provide a stable environment for his child, by understanding the effects of mental health issues and [the risk they pose] to his child." The intent of the case plan was to ensure the safety, permanency, and wellbeing of S.P, with the ultimate goal of reuniting appellant with his child.

On March 18, 2014, the case manager met with appellant to discuss the case plan. During this meeting, the case manager discussed with appellant the requirement that he demonstrate he could provide a stable environment for S.P. by understanding and acknowledging the effects of S.J.'s mental health issues and the risk those issues posed to S.P. Appellant testified that the case manager told him that if he continued to associate with S.J., he could not have S.P. in his care. At this meeting, the case manager provided appellant with a copy of the case plan, but appellant refused to sign it.

**Failure to Maintain Weekly Visits with S.P.**

The case manager initially set up appellant's supervised visits with S.P. in the foster home because that would allow appellant more flexibility in scheduling visits during evenings and weekends. Appellant agreed to that at first, but in May 2014, he requested that visits take place at a county site instead, which the case manager accommodated.

In June 2014, appellant and S.J. moved from St. Paul to Owatonna, where they resided until late August 2014. Appellant testified that he moved to Owatonna in order to

6

obtain stable housing, work, and save money to return to the Twin Cities. Appellant did not provide the case manager with his address in Owatonna, and he did not tell the case manager that he was living with S.J. in Owatonna. While appellant was in Owatonna, he had no contact with S.P, and he did not contact the case manager for assistance in visiting S.P. The GAL testified that appellant and S.J. "disappeared for three months and made [a] unilateral decision to disengage from their children." The GAL testified that he had less contact with appellant than in a typical case because appellant did not contact him, and the GAL lacked contact information for appellant throughout much of the proceedings. The district court found that "for the vast majority of [S.P.'s] out of home placement," appellant's whereabouts were unknown to the case manager. The district court also found that even when appellant moved back to St. Paul, he failed to consistently visit S.P.

Back in May 2014, the foster care provider, S.J.'s mother, was granted an order for protection (OFP) against S.J., which prevented S.J. from having any contact with her, S.P., and S.P.'s siblings. However, during one of appellant's visits with S.P. in early 2015, he allowed S.J. to have contact with S.P. Appellant failed to tell the visitation supervisor that there was an active OFP in place, even though appellant knew about the OFP. The district court found that both appellant and S.J. "demonstrated an extreme lack of judgment when they chose to deliberately violate the [OFP]."[2] Appellant testified that

---

[2] Appellant correctly notes that the district court erroneously stated that *appellant* violated the OFP, as the OFP was issued only against S.J., not appellant. Appellant does not dispute, however, that he knowingly helped S.J. violate the OFP by having contact with S.P.

he did not visit S.P. for the month and a half prior to trial because he was going through some "[p]ersonal stuff" because of "this whole case situation."

**Delay in Obtaining Parenting Assessment and Failure to Follow Recommendations of Parenting Assessment**

On May 6, 2014, the county referred appellant to Dr. Frayda Rosen to complete a parenting assessment. But, appellant did not undergo a parenting assessment for approximately eight months. He scheduled two appointments in the winter of 2014, but failed to show up, and he cancelled another appointment. Dr. Rosen assessed appellant on January 20 and February 11, 2015. Dr. Rosen opined that appellant required improved parenting knowledge and did not have a good understanding of early childhood development. Dr. Rosen noted that appellant did not acknowledge S.P.'s developmental delays, "suggesting he would not support the services [S.P.] require[s] to prevent her from developing more severe delays as she age[s]." Dr. Rosen opined that appellant did well interacting with S.P. and meeting her needs during the parental observation. Dr. Rosen concluded that "[t]he biggest barrier preventing [appellant] from being a successful and safe parent seemed [to be] his judgment, choices and behaviors[,] especially in his relationship with [S.P.'s] mother."

Dr. Rosen made several recommendations, including that appellant maintain adequate, safe, and stable housing; attend a father's support group; maintain stable employment; receive parenting education and skills training during supervised visits with S.P.; and "remove himself from individuals who are unstable" or who are "involved in substance abuse and/or . . . with the law." At trial, Dr. Rosen testified that appellant's

8

deficits could be addressed with parenting education classes. Appellant did not provide the case manager with any evidence that he had completed any of Dr. Rosen's recommendations. The district court found that at the time of the TPR trial, appellant continued to reside with S.J., "who admitted at trial that she had been using cocaine on a weekly basis."

Appellant testified that he planned to co-parent S.P. with S.J. if he was awarded custody of S.P. He testified that he would allow S.J. to care for S.P. even when he is not present. He testified that he does not believe that S.J. has any mental health problems and that her chemical use of cocaine does not affect her ability to parent S.P. Appellant testified that S.J. "doesn't pose a risk" to S.P. Based on this testimony, the district court found that appellant "would be unable to protect [S.P.] from [S.J.] if [S.P.] was returned to his care." The case manager testified that if appellant regained custody of S.P., he would need to "separate himself" from S.J., and the case manager did not believe that he would be able to do so. She also testified that appellant continues to minimize S.J.'s chemical use and mental health issues and that this minimization could pose a risk to S.P.

**Failure to Participate in the FATHER Project**

The FATHER Project is an organization that provides parenting resources for fathers. Appellant testified that he tried to enroll in the FATHER Project to satisfy one of the conditions of his case plan. He received a letter dated March 28, 2014, informing him that he could not join the FATHER Project, but indicating that other similar programs were available and providing contact information. However, appellant failed to show this letter to the case manager or to seek out any other parenting support group.

**Failure to Maintain Stable Housing**

Appellant testified that he has two evictions on his record, which has made it difficult for him to obtain housing independently. When S.P. was born, appellant was living in a hotel and was unemployed. When appellant briefly had custody of S.P. in March 2014, he was living with his brother. Appellant testified that after S.P. was removed from his care and placed in foster care, appellant was "bouncing around with family members" for a while. Appellant and S.J. lived in Owatonna during the summer of 2014. At the time of trial, appellant was living with S.J. in a duplex that S.J. leased, and they had been living there for six or seven months. Appellant testified that he was currently working at Burger King. The case manager testified that she was concerned appellant would be unable to provide safe and stable housing for S.P. because his housing was dependent upon S.J.

**Lack of Attendance at S.P.'s Medical Appointments**

Appellant did not attend any of S.P.'s medical appointments throughout the proceedings. Appellant never called the case manager to see if he could attend any of S.P.'s medical appointments. S.P. underwent a special education evaluation on June 27, 2014, and was deemed eligible for early childhood special education services based on her below-average scores in the areas of motor skills and self-care. Appellant did not make any attempts to learn more about S.P.'s special needs, and he did not attend any appointments regarding S.P.'s special needs. Appellant testified that he did not agree with S.P.'s special needs determination, but stated that if S.P. were returned to his care, he would have her continue with occupational therapy. The case manager testified that if

10

S.P. was returned to appellant's care, appellant would not be able to provide for S.P.'s special needs or work effectively with her care providers.

**Failure to Stay in Contact with and Cooperate with Case Manager and GAL**

On November 7, 2014, the county petitioned the district court for termination of appellant's and S.J.'s parental rights. By that date, S.P. had been in out-of-home placement for approximately 243 days. During the six months preceding the TPR trial, the GAL tried to speak with appellant at hearings, but appellant was unwilling to speak with the GAL. The case manager testified that appellant called her only four or five times throughout the pendency of the case. Appellant testified that the last time he called the case manager to discuss S.P. was May 2014. He also testified that he never provided the case manager with his phone number, but he stated that he could have been reached through S.J.

**TPR Trial**

The district court held a three-day trial in April 2015 on the county's petition to terminate appellant's and S.J.'s parental rights. By the time of trial, S.P. had been in out-of-home placement for over one year. The GAL testified that appellant "had an opportunity to step up to a case plan and didn't take it." The GAL and the case manager recommended that appellant's parental rights be terminated. After hearing testimony as to the above facts, the district court filed an order terminating appellant's parental rights. The district court concluded that the county had proven by clear and convincing evidence that appellant's parental rights should be terminated on three different statutory grounds,

11

that this decision was in the best interests of S.P., and that the county had made reasonable efforts to reunite appellant with S.P. This appeal followed.

## DECISION

Appellant argues that the record lacks clear and convincing evidence to support the termination of his parental rights under the statute. Courts presume that natural parents are fit to care for their children, and "[p]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (quotation omitted). The petitioning county bears the burden of proving statutory grounds for termination by clear and convincing evidence. *Id.* Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). "[O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying . . . facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see* Minn. Stat. § 260C.301, subd. 1(b) (2014) (listing bases for terminating parental rights). We will affirm the district court's decision if any of the statutory grounds for termination are supported by clear and convincing evidence and termination of parental rights is in the child's best interests. *In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). We grant the district court's decision considerable deference because the district court "is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

12

**I.**

The district court found clear and convincing evidence in support of three statutory bases for terminating appellant's parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5). Appellant asserts that none of these three bases were sufficiently supported by clear and convincing evidence. We will address termination under section 260C.301, subdivision 1(b)(5), as only one statutory ground must be supported by clear and convincing evidence in order for us to affirm. *See T.R.*, 750 N.W.2d at 661.

Under Minn. Stat. § 260C.301, subd. 1(b)(5), parental rights may be terminated if "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." In analyzing this statutory ground, the district court found that the county's efforts at reunification were reasonable. Appellant disputes this finding. In any TPR proceeding, the district court must make "specific findings" that the county made reasonable efforts to reunify the child and the parent. Minn. Stat. § 260C.301, subd. 8 (2014). To determine whether reasonable efforts were made, the district court must consider "whether [the] services offered to the child and family were: (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014).

"Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotations omitted), *review denied* (Minn. Mar. 28,

2007). "The quality and quantity of efforts to rehabilitate and reunify the family impact the reasonableness of those efforts." *Id.* A district court's finding that the county made reasonable efforts to reunify the parent with the child is a finding of fact that we analyze for clear error. *See J.R.B.*, 805 N.W.2d at 901 (stating this court reviews district court's findings of fact for clear error). "A finding is clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. 2000) (quotations omitted).

The county tried to place S.P. with appellant in March 2014, but that placement lasted only three days due to the physical altercation that occurred between appellant and S.J. in the presence of S.P. On March 18, 2014, the case manager met with appellant and completed a family functional assessment, which was used to prepare appellant's case plan. The case plan identified appellant's parenting strengths and deficits and offered him services to address the reasons that led to S.P.'s out-of-home placement. The case plan provided contact information for Dr. Rosen and the FATHERS Project. The GAL testified that appellant's case plan was appropriate. The county filed the case plan with the district court on April 11, 2014.

The county made efforts to help appellant complete his case plan. The case manager provided appellant with a referral to Dr. Rosen and arranged for appellant to have supervised visits with S.P. In May 2014, appellant requested that the visitation location be changed, and the county accommodated that request. Around the same time period, the case manager met with appellant again to discuss an amended version of his case plan. Appellant again refused to sign the case plan.

14

For the next three months, the case manager was unable to contact appellant to discuss his case plan or offer him additional services because appellant moved to Owatonna with S.J. and did not provide any contact information or contact the case manager. The record indicates that appellant completely disengaged from his case plan during the summer of 2014. Even after appellant returned to St. Paul, he did not provide his contact information to the case manager. The district court found that for the "vast majority" of S.P.'s out-of-home placement, appellant's whereabouts were unknown to the case manager. The record supports this finding. Yet, despite appellant's general lack of engagement with his case plan, the county continued to facilitate his supervised visits with S.P.

Appellant argues that the case plan was not relevant or adequate because it failed "to address the most concerning issue[] that led to the out-of-home placement," i.e., helping appellant develop insight into S.J.'s mental health problems and the risk that her problems posed to S.P. This argument is unpersuasive. While the case plan itself did not explain how appellant was to develop this insight, the parenting assessment addressed this issue. Dr. Rosen opined that the "biggest barrier" preventing appellant from safely parenting S.P. had to do with his "judgment, choices and behaviors" in his relationship with S.J. Dr. Rosen recommended that appellant avoid people who are "unstable" or "involved in substance abuse." Dr. Rosen also recommended that appellant receive parenting education and skills training. If appellant had followed through on these recommendations, he likely would have gained insight into S.J.'s mental health problems and how her mental instability negatively affected the wellbeing of their child.

15

Appellant's other arguments as to the reasonableness of the county's efforts also lack merit. He asserts that the case manager's caseload was too heavy and prevented her from giving appellant the assistance he needed. The county correctly argues that this assertion is a "smokescreen" for appellant's own failure to engage in the case plan and to provide the case manager with his phone number or other contact information. Appellant also argues that the case manager and the GAL focused only on the "less substantive" requirements of the case plan, but this argument is plainly contradicted by the record, which shows that appellant failed in following Dr. Rosen's recommendations, consistently visiting S.P. on a weekly basis, attending S.P.'s medical appointments, and maintaining stable housing. Because of his failure to follow the case plan, appellant also failed to gain insight into S.J.'s mental health problems and her inability to parent their child. The district court's finding that the county made reasonable efforts toward reunification is not clearly erroneous.

The district court determined that the county's reasonable efforts toward reunification failed to correct the conditions that led to S.P.'s out-of-home placement. At the time of S.P.'s birth, appellant was unemployed and did not have his own housing. In March 2014, S.P. was designated as a CHIPS due to S.J.'s mental instability and her previous history of child maltreatment. Shortly thereafter, S.P. was removed from appellant's custody because appellant did not protect S.P. from S.J.'s mental instability and from his violent encounter with S.J. Appellant's case plan was designed to correct the conditions leading to S.P.'s placement in foster care and to ensure S.P.'s safety,

16

permanency, and wellbeing. But, appellant failed to comply with his case plan in several ways.

Appellant waited eight months to undergo a parenting assessment. Once he was assessed, he failed to follow through on most of Dr. Rosen's recommendations, including receiving parenting skills training, attending a father's support group, and removing himself from people who abused drugs. Appellant failed to maintain stable housing because his housing was dependent upon S.J., who used cocaine and had untreated mental health problems, both of which posed a risk to S.P. Appellant failed to visit his daughter weekly, and there were periods when appellant had no contact with S.P., most notably when he moved to Owatonna with S.J. Finally, appellant never attended any of S.P.'s medical appointments.

Moreover, appellant failed to comply with his case plan's requirement that he protect S.P. from S.J. by allowing S.J. to join him on one of his supervised visits in violation of the OFP that was in place. At trial, appellant demonstrated that he does not understand the risk that S.J.'s mental health problems pose to S.P. by stating that he does not believe that S.J. has any mental health problems. The district court found that appellant lacked insight into S.J.'s mental health and chemical needs, which greatly inhibited his ability to parent S.P. The district court also found that appellant lacks the basic parenting skills necessary to parent his child. These findings are supported by the record.

The district court did not abuse its discretion in terminating appellant's parental rights under Minn. Stat. § 260C.301, subd. 1(b)(5), because, despite the county's

17

reasonable efforts, appellant failed to correct the conditions leading to the out-of-home placement.

**II.**

Appellant also contends that the best interests of the child do not support the termination of his parental rights. District courts must give "paramount consideration" to the best interests of the child when terminating parental rights. Minn. Stat. § 260C.301, subd. 7 (2014). A district court does this by weighing three factors: (1) the child's interest in maintaining the parent-child relationship; (2) the parent's interest in maintaining that relationship; and (3) any competing interest of the child. *In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013). Competing interests of the child "include a stable environment, health considerations, and the child's preferences." *Id.* "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. In its order terminating parental rights, the district court must explain its rationale for concluding why termination is in the child's best interests. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). We review the district court's best interests determination for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905.

Here, the district court cited the three *M.A.H.* factors and concluded that termination of appellant's parental rights was in the best interests of S.P. The district court found that S.P.'s competing needs substantially outweighed any interest that appellant or S.P. had in maintaining the parent-child relationship. The district court found that S.P. needs a safe, stable, and loving home; a parent who can protect her from

18

abuse and neglect; a parent who will meet her basic and special needs; and a parent who will prioritize her needs over the parent's own needs. The district court found that appellant cannot provide for any of these needs. These findings are well supported by the evidence in the record. Both the case manager and the GAL testified about S.P.'s needs, and both testified that appellant was unable to meet S.P.'s basic or special needs at the time of trial or in the reasonably foreseeable future. Both also testified that termination of appellant's parental rights is in S.P.'s best interests.

The district court also found that S.P. needed permanency and that it was "contrary to [S.P.'s] best interest[s] to delay permanency any further." The importance of permanency for children is recognized by both the legislature and the courts. *See* Minn. Stat. § 260C.204 (2014) (providing for permanency progress review when child has been in foster care for six months); *In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn. 2003) ("Each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home and can seriously affect a child's chance for permanent placement."). Here, the case manager testified that termination of appellant's parental rights will provide S.P. with the permanency, consistency, and stability that S.P. needs.

The district court did not abuse its discretion in determining that termination of appellant's parental rights is in the best interests of S.P.

**Affirmed.**