*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0692**

In the Matter of the Welfare of the Children of: J.M.B., Parent.

**Filed October 17, 2016
Affirmed
Reyes, Judge**

Hennepin County District Court
File No. 27JV154880

Mary F. Moriarty, Chief Hennepin County Public Defender, Paul J. Maravigli, Assistant County Public Defender, Minneapolis, Minnesota (for appellant J.M.B.); and

Victoria M. Yang, Assistant County Public Defender, Minneapolis, Minnesota (for father C.J.J.); and

Mary A. Torkildson, Assistant County Public Defender, Minneapolis, Minnesota (for child 1 and child 2)

Michael O. Freeman, Hennepin County Attorney, Michelle A. Hatcher, Assistant County Attorney, Minneapolis, Minnesota (for respondent HCHS)

Eric S. Rehm, Burnsville, Minnesota (for guardian ad litem)

Considered and decided by Jesson, Presiding Judge; Stauber, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REYES**, Judge

Appellant-mother J.M.B. challenges the district court's termination of her parental rights. Because the district court did not abuse its discretion by concluding that (1) the

Hennepin County Human Services and Public Health Department (the department) has made reasonable efforts to rehabilitate J.M.B. and reunite the family; (2) there is a statutory ground for termination; and (3) termination is in the best interests of the children, we affirm.

**FACTS**

In November 2013, the department received educational-neglect reports regarding three of J.M.B.'s then-seven children[1] and a medical-neglect report regarding J.M.B.'s failure to follow through with recommended services to address Child 3's eye issue. Following these initial reports, the district court adjudicated the children as children in need of protection or services (CHIPS). The district court's CHIPS order stated, "It is in the best interests and safety of the children to remain with [J.M.B.] under protective supervision, as long as [J.M.B.] is in full compliance with the conditions ordered by this Court." In addition, the order established the following case plan for J.M.B.:

- Ensure all children attend school without unexcused absences or receive early childhood screening to address educational needs;
- Ensure all the children's needs are met, including, but not limited to, medical, dental, psychological and educational by accessing services and following all recommendations;
- Complete a combined psychological and parenting assessment and follow all recommendations;
- Participate in in-home parenting education;
- Obtain and maintain safe and suitable housing; and

---

[1] This appeal involves the termination of J.M.B.'s parental rights to each of her eight children. This opinion will refer to each child by number (i.e. the oldest child will be addressed as "Child 1" and the youngest as "Child 8") and will refer to the children collectively as "the children."

- Cooperate with child protection social worker, including maintaining ongoing contact, allowing home visits and signing all releases of information requested.

J.M.B.'s case plan was subsequently amended to also include the following: domestic violence programing; in-home parenting education, individual therapy, family therapy, and an adult rehabilitative mental-health-services (ARMHS) worker; and cooperation with a representative payee. In addition, based on domestic-violence reports, the district court ordered C.J.J., the father of several of the children,[2] to have only supervised visits with the children.

Following these case-plan amendments, Lynn Hoff, a Hennepin County social worker, conducted an investigation into separate reports of physical abuse of the children and domestic violence between J.M.B. and C.J.J. During Hoff's interviews with J.M.B. and the children, J.M.B. denied any physical abuse, was unwilling to discuss domestic violence, and would not allow Hoff to interview the children outside of her presence. One child informed Hoff that the children "get a whooping" when they get in trouble, which caused two of the children to respond, "You're not supposed to tell [Hoff] that." In a subsequent interview, Child 2 and Child 4 shared the following details with Hoff: Child 4 was recently hit over the head with a pot, which caused a bump; C.J.J. had choked J.M.B. the previous weekend; the children had previously witnessed similar instances of domestic violence; and J.M.B. had told the children not to share such information with Hoff. Notably, Child 4 told Hoff that he had witnessed domestic

---

[2] C.J.J. is the father of Child 3, Child 4, Child 5, Child 6, and Child 7. He signed a written consent to terminate his parental rights in the presence of the district court.

3

violence frequently and was no longer surprised or scared by it. Hoff made maltreatment findings for neglect-endangerment and physical abuse against J.M.B.

In August 2014, Charlotte Miller, a Hennepin County child protection social worker, learned that J.M.B. was allowing some of the children to stay in the care of C.J.J. in violation of a district court order. In response, the district court ordered the removal of Child 3, Child 4, Child 5, and Child 6 from J.M.B.'s care. Shortly thereafter, Child 5 and Child 6 were returned to J.M.B.'s custody. Around this same time, the department learned J.M.B. had an outstanding bill for utilities. The department had made efforts to assist J.M.B. with this bill. Based on lack of case-plan compliance, school absences, lack of providers, and the utilities issue, Child 1, Child 2, Child 5, Child 6, and Child 7 were removed from J.M.B.'s care, placed into foster care, and legal custody was transferred to the department.

J.M.B. moved from Minneapolis to Mayer, Minnesota, in January 2015. In April 2015, a child-protection report was made to Carver County in response to Child 5 engaging in inappropriate sexual behavior with another child at school. Child 5 also reported that he had been inappropriately touched by his siblings. Jill DeMars, a Carver County social worker, conducted investigations regarding these incidents. During these interviews, which included Child 1, Child 2, Child 3, Child 4, Child 5, and Child 6, the children reported a number of instances involving inappropriate behavior between the children in their home. DeMars also learned that the children had observed J.M.B. and C.J.J. engaging in sexual acts. In a subsequent interview, J.M.B. acknowledged that her

4

children could have viewed C.J.J.'s pornography in her home. Following her investigation, DeMars made a maltreatment finding against J.M.B.

Throughout August 2015, Child 1, Child 2, Child 5, Child 6, and Child 7 were returned to J.M.B.'s care on a trial home basis. However, Child 5 was returned to foster-home placement following inappropriate sexualized behavior with a sibling. During the trial home visit, J.M.B. used Child 1 and Child 2's school-issued iPads to take inappropriate photographs of herself. As a result, Child 1 and Child 2 were no longer permitted to bring school-issued iPads home to do homework.

In December 2015, the trial home visit ended for Child 1, Child 2, Child 6, and Child 7 following a domestic incident involving J.M.B. and K.K.E., the father of Child 8, that occurred in J.M.B.'s home with the children present. This domestic incident was physical, and, at one point, J.M.B. asked Child 2 to grab a knife. Child 6 later told a foster parent that he was involved and had held on to K.K.E.'s leg during the incident. Additionally, the department noted that J.M.B. was failing to comply with her case plan in a number of ways: (1) J.M.B. was missing appointments with providers; (2) Child 1 and Child 2 were struggling academically and with school attendance; and (3) J.M.B. was failing to pursue recommended services for the three youngest children. J.M.B. also acknowledged that she allowed her medications to lapse around this time.[3] J.M.B. did not cooperate in ending the trial home visit, and law enforcement was required to locate the children.

---

[3] J.M.B. has been diagnosed with, and prescribed medication for, anxiety, posttraumatic stress disorder, and depression.

After the department removed the children from J.M.B.'s care, Child 1 and Child 2 both ran away from their foster homes. Prior to returning to foster care, J.M.B. gave Child 2 a cell phone to maintain contact with J.M.B. while in placement. J.M.B. requested Child 2's address and sent a text message stating she would be there to pick up Child 2. Miller testified to her suspicion that J.M.B. knew Child 1 and Child 2's whereabouts when they ran away from foster care. Also, Helen Ogbemudia, a foster parent for the three youngest children, testified that Child 6 shared that J.M.B. had told Child 1 and Child 2 to run, but Child 6 was not supposed to run because he was too little.

A six-day termination-of-parental-rights trial was held in January and February 2016. J.M.B. testified and was represented by legal counsel. The trial included extensive testimony and exhibits relating to the children's various special needs and behavioral issues, on-going school-related issues, and J.M.B.'s failure to properly address these matters. On March 22, 2016, the district court ordered the termination of J.M.B.'s parental rights under Minn. Stat. § 260C.301, subd. 1(b)(2), (5), (8) (2014), determining that the department made reasonable efforts to rehabilitate J.M.B. and to reunite the family, there is a statutory ground for termination, and termination is in the best interests of the children. J.M.B. moved for a new trial and/or amended findings, which the district court denied. J.M.B. appeals.

## DECISION

Courts presume that natural parents are fit to care for their children, and "[p]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (quotation omitted).

6

Termination requires clear and convincing evidence that (1) the department has made reasonable efforts to rehabilitate the parent and reunite the family; (2) there is at least one statutory ground for termination; and (3) termination is in the children's best interests. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "[O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying . . . facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012); *see* Minn. Stat. § 260C.301, subd. 1(b) (listing bases for terminating parental rights). The "district court's individual fact findings will not be set aside unless our review of the entire record leaves us with a definite and firm conviction that a mistake has been made." *In re Welfare of D.T.J.*, 554 N.W.2d 104, 107 (Minn. App. 1996) (quotation omitted).

**I.    The district court did not abuse its discretion in determining that the department made reasonable efforts to rehabilitate J.M.B. and to reunite the family.**

In order to terminate J.M.B.'s parental rights, the district court must make "specific findings" that the department made reasonable efforts to rehabilitate J.M.B. and to reunite the family. Minn. Stat. § 260C.301, subd. 8. "When determining whether reasonable efforts have been made," the district court must consider "whether services to the child and family were: (1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the

7

circumstances." Minn. Stat. § 260.012(h) (2014). "Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotations omitted), *review denied* (Minn. Mar. 28, 2007).

The district court found that the department provided the following nonexclusive list of services to J.M.B.: referral for psychological, mental, or behavioral health services and for psychiatric services or medication management; parenting assessment/education; in-home services; an ARMHS worker; child services and evaluations; transportation and phone assistance; child protection and child services case-management services; medical, dental, and educational services for the children; domestic-violence programming; safety planning; home-based services; supervised and unsupervised visitation; and a trial home visit. Social worker Miller testified at length regarding the department's extensive efforts and the case-plan services made available to J.M.B. throughout 2014 and 2015. Miller testified that, despite the department's dedicated assistance and efforts, J.M.B.'s case-plan compliance was inconsistent. The district court also noted that, during the 26 months that J.M.B.'s case was under its jurisdiction, regular hearings were held to ensure J.M.B. received the necessary services and efforts for rehabilitation and reunification.

As a result, the district court determined that the department made reasonable efforts to rehabilitate J.M.B. and to reunite her with the children. The district court further determined that the department offered "services that were timely, available, relevant and culturally appropriate for the children and family, to remedy the circumstances requiring the foster care placement and permit reunification." Based on a

careful review of the record, we conclude that the district court's finding that the department's extensive efforts between 2014 and 2015 were genuine and adequate to address this family's unique needs is not clearly erroneous. Therefore, the district court did not abuse its discretion in determining that the department made reasonable efforts to rehabilitate J.M.B. and to reunite the family.

**II.      The district court did not abuse its discretion in determining that at least one of the statutory grounds for termination had been met.**

The district court found clear and convincing evidence in support of three statutory bases for terminating J.M.B.'s parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (5), (8). Since only one statutory ground must be supported by clear and convincing evidence, our analysis will address subdivision 1(b)(5). *See In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008).

A statutory basis for terminating parental rights exists under subdivision 1(b)(5), when "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement" out of the home. Subdivision 1(b)(5) further provides that a failure of reasonable efforts is presumed where

> (i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. In the case of a child under age eight at the time the petition was filed alleging the child to be in need of protection or services, the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the out-of-home placement plan; (ii) the court has approved the out-of-home placement plan . . . ; (iii) conditions leading to the out-of-home placement have not been corrected . . . ; and (iv) reasonable

9

efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

Minn. Stat. § 260C.301, subd. 1(b)(5)(i)–(iv). The district court determined that this presumption applies to the seven oldest children, and "[w]hile the presumption can not apply to Child 8[, based on her age], she is similarly situated to her siblings and the same issues that prevent [J.M.B.] from providing them with care apply to her. In other words, the district court determined that, even without the presumption under subdivision 1(b)(5), Child 8, and in turn the other children, meet this statutory factor.

As stated above, the record supports the district court's conclusion that the department made reasonable efforts to rehabilitate J.M.B. and to reunite the family. The district court further determined that J.M.B. "has not utilized these efforts to correct the conditions that led to out-of-home placement." While the record does include evidence of some case-plan compliance, the district court also determined:

> Any argument that [J.M.B.] has made progress with her services is offset by her continued poor decision making, her failure to follow through with meeting her children's needs and her demonstrated lack of insight. She continues to exhibit behaviors that would be detrimental to children in her care, and she has shown no ability to maintain any progress made with services.

The record supports each of these findings, which demonstrates that the department's reasonable efforts, under the district court's direction, have failed to correct J.M.B.'s behaviors and decisions that led to the children's out-of-home placement. Therefore, the district court did not abuse its discretion in determining that a statutory ground for termination exists under subdivision 1(b)(5).

10

### III. The district court did not abuse its discretion in determining that termination was in the children's best interests.

In a termination proceeding, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7. "We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d at 905 (citing *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 95 (Minn. App. 2008)), *review denied* (Minn. Jan. 6, 2012). "[T]he court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004) (citation omitted). Competing interests of the child "include a stable environment, health considerations, and the child's preferences." *In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013). In its termination order, the district court must explain its rationale for concluding why termination is in the child's best interests. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003).

The district court noted that J.M.B. loves her children, and the children are bonded to her. However, the district court also noted that J.M.B.'s "behaviors have negatively impacted [the children] and will continue to do so if she is allowed to remain their legal mother." The district court also found that the "children have experienced a significant amount of instability and trauma during their lives as a result of their mother's issues." In addition, social worker Miller and the children's guardian ad litem, Cheryl Wilson, both testified that termination was in the children's best interests because J.M.B. is

11

unable to meet her children's needs. As a result, the district court determined that, despite J.M.B. and the children's desires to maintain the parent-child relationship, it is in the best interests of the children to terminate J.M.B.'s parental rights.

J.M.B. asserts that, with regard to the December 2015 domestic-violence incident, "the recommendation for TPR [cannot] be based upon a woman's inability to prevent her violent assault in her home, or her children from seeing this." We agree. But based on our careful review of the record and the district court's findings, the December 2015 incident is not the sole reason supporting termination. Rather, the record demonstrates that this particular domestic-violence incident is one example of a continuing pattern of domestic instability and safety concerns that has adversely affected the children and would continue to do so. The district court's findings are firmly supported by the record, which includes ample evidence of the children's special needs, behavioral issues, and ongoing exposure to situations that are inappropriate for young children. And, because the children's best interests must be the paramount consideration, we conclude that the district court did not abuse its discretion in determining that termination of J.M.B.'s parental rights is in the best interests of the children.

**IV.  The district court's adoption of the department's proposed findings is not grounds for reversal.**

J.M.B. argues that "[i]n light of the juvenile court's issuance of an order that is virtually verbatim with the Department's proposed findings—with the only noticeable additions being the juvenile court's comments about [J.M.B.'s] history with, and response to, domestic violence, which the Department already addressed—it is clear the

12

court did not give this case an independent evaluation of the evidence." J.M.B. asserts that this reason is grounds for reversal. We disagree.

In response to a similar argument, the Minnesota Supreme Court has stated a preference for the district court to independently develop its own findings. *In re Children of T.A.A.*, 702 N.W.2d 703, 707 n.2 (Minn. 2005). However, it also recognized the abbreviated 15-day deadline that accompanies juvenile-protection matters. *Id.* When a district court fails to independently develop its own findings, it is difficult for the reviewing court to determine whether the district court carefully considered the evidence, the witnesses, and the entire case. *Dukes v. State*, 621 N.W.2d 246, 258 (Minn. 2001).

In this case, the majority of the district court's findings come directly from the department's proposed findings. But, as J.M.B. recognizes, the district court's findings did include some additions. Moreover, the record demonstrates that the district court was actively and substantively involved throughout the trial proceedings. Such changes and active participation are indicative of the district court's "independent assessment of the evidence." *See T.A.A.*, 702 N.W.2d at 707 n.2 ("[T]he district court's findings should reflect the court's independent assessment of the evidence and this is best accomplished by the district court exercising its own skill and judgment in drafting its findings.").

In addition, despite the few inaccuracies raised by J.M.B., the district court's findings are supported by numerous citations to exhibits and testimony. Such support differentiates the district court's findings from previous instances where appellate courts have criticized the adoption of "conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer*, 470 U.S. 564, 572, 105 S. Ct. 1504, 1510 (1985).

13

Therefore, we conclude that, under these facts, the district court's findings are not clearly erroneous and do not warrant reversal.

**Affirmed.**